UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :

UNITED STATES OF AMERICA,        :  Case No. S5 13 Cr. 268 (JMF)

              Defendant,         :

          v.                      :

ABRAHAM MOSSERI,              :

              Defendant.        :

------------------------------------------------------------X


## SENTENCING MEMORANDUM OF ABRAHAM MOSSERI


Jay K. Musoff
Loeb & Loeb LLP
345 Park Avenue
New York, NY  10154
Telephone:  (212) 407-4212

*Counsel for Defendant Abraham Mosseri*


Dated:  May 7, 2014

**I.      INTRODUCTION**

Abraham Mosseri respectfully submits this memorandum in connection with his sentencing in the above-captioned case, currently scheduled for May 21, 2014.  Abe pled guilty to the misdemeanor offense of aiding and abetting the participation of a financial institution in a lottery, and accepts full responsibility for his conduct.  He understands that he is responsible for the impact of this conviction on his life, and respectfully asks that the Court consider him in his entirety, and not just by the aberrational conduct detailed in the Superseding Indictment and the Presentence Report.  Abe has strived to live a law-abiding life, and deeply regrets his actions.

**II.     PROCEDURAL HISTORY**

On April 16, 2013, Abe surrendered in connection with the charges alleged in Indictment 13 Cr. 268.  On January 24, 2014, Abe pleaded guilty, pursuant to a written plea agreement, to the misdemeanor offense of aiding and abetting the participation of a financial institution in a lottery, in violation of Title 18, United States Code, Sections 1306 and 2.  In connection with his plea, Abe stated that he assisted others to transfer funds, which represented monies he bet on sporting events, to and from banks.  Abe did this in connection with his own personal gambling.  Under the terms of the plea agreement, he also forfeited $20,000.

**III.    PERSONAL BACKGROUND**

  **A.      Family and Education**

Abe was born on June 21, 1973, in Brooklyn, New York, to parents Salomon and Helen Mosseri.  Salomon Mosseri, age 70, is a retired computer consultant.  His wife Helen, is 64 years old and a retired bookkeeper.  Abe is the oldest of three children.  His sister, Alice Mosseri, age 39, is a part-time bookkeeper, and lives in Cedarhurst, New York.  His younger brother, Morris Mosseri, is 34.  Abe has one son, Joakin, age 9, who lives with his mother Louiza Kaperonis.  Abe dated Ms. Kapernois for approximately six months.  Although Abe is not in contact with

2

Ms. Kapernois, he is current with his monthly child support payments, and has never been delinquent with those payments.

Abe's parents both emigrated from Egypt during the Suez Canal Crisis to the United States to flee religious persecution against Jews. They later met in the United States and raised Abe in an Orthodox Jewish community in Brooklyn, New York. From a young age, Abe succeeded in games, particularly those that required a high-level of pattern recognition. Abe's aunt, Ruth Choueka, observed that Abe "always loved to play and at a very young age amazed us all by consistently winning; starting first with [C]onnect [F]our and checkers, and graduating to bridge, backgammon, chess, etc." (Letter from Ruth Choueka, attached as Exhibit A, at 1). Abe's aunt noted that "[a]lthough it was embarrassing to lose to a child, we soon learned to accept it." *Id*.

Abe graduated from Magen David Yeshiva in 1991, and then New York University in 1995, where he studied at the Stern School of Business and obtained a Bachelor's Degree in finance in 1995. A friend and classmate of Abe's from New York University writes that, even when they did not know each other well, Abe "was a great partner in class, always willing to help me with accounting homework and never made me feel any less smart." (Letter from Eileen Bressler, attached as Ex. A, at 2).

### B. Employment and Professional Gambling

Following his graduation from New York University, Abe tried to get a job in finance, and wound up at Investors Associates. Abe described Investors Associates as a "corrupt boiler room," and quit that job because he did not want to be involved in their practices. Although this was Abe's first professional job following graduation from college, and although Investors Associates agreed to pay him about $30,000 per year, Abe was not comfortable with the way

3

they did business and quit.  A few years later, after Abe had quit, the principals of Investors Associates were charged by the Securities and Exchange Commission with manipulating the market price of microcap securities, and the SEC described the firm as a "boiler room" which employed more than 300 cold callers and representatives in the firm's largest branch.  *See* SEC Litigation Release No. 16270, Sept. 2, 1999, *available at* www.sec.gov/litigation/litreleases/lr16270.htm.

After quitting the firm, Abe began playing backgammon, hearts, and gin rummy legally at various private clubs for income.  Because of his ability to concentrate and recognize patterns, Abe was relatively successful at these efforts – sometimes earning more than $50,000 per year.  As Abe's aunt wrote, Abe "relies on his powers of concentration to overcome his opponents."  (Ex. A, at 1).  More recently, Abe has earned most of his income playing poker professionally, and since about 2004, he has been self-employed as a professional gambler.  "Although not the lifestyle his parents or I would have chosen for him, it's the life that gives him pleasure and that he has chosen for himself," writes Abe's aunt.  (Ex. A at 1).  Abe's diligent immersion into the strategy of the game made him successful as a professional poker player.  Abe has played in various poker tournaments, including the World Series of Poker, in which he has played every year since 2004.

Although Abe is a professional gambler, Abe is not a professional *sports* gambler.  Abe's sports betting has been more recreational, and is often made with other players at or during poker games.  These bets are made head-to-head with other gamblers, which is sometimes described as "crossed," without a bookie, so that they eliminated the "vigorish" or "vig" that a bookie would charge.

As a result of his success in poker and other skill-based games, Abe has at times earned a comfortable life, which he generously has shared with others. Abe's aunt writes that "Abe has a good and generous heart," and that "when my step-father was dying and in a nursing home, Abe offered to pay for a nurse so he could be treated at home." (Ex. A at 1). Abe also offered financial support to his grandmother and parents after they retired, which, according to his aunt, "they thankfully have not needed." *Id*. Abe's generosity is not limited to financial assistance, but includes small acts of kindness, such as visiting the sick or elderly, that in their own way may be more important. For example, Abe's friend Ted Louloudes noted that Abe was there for him when his parents died, and also when he was in the hospital. Mr. Louloudes also writes:

> Since my strokes I now live in an assisted care facility in Bradenton. I used to own a [G]reek restaurant and my world revolves around food! In the assisted care facility the food is absolutely horrible [sic]. Abe visits me whenever he can. He brings me delicious edible food like Spanakopita, or a Greek salad. I am forever grateful to have a friend in Abe Mosseri.

(Letter from Ted Louloudes, attached as Ex. A, at 3).

### IV. SENTENCING GUIDELINES ISSUES

#### A. Presentence Report Findings

We received a draft of the Presentence Report ("Draft PSR") on April 15, 2014, and submitted a letter to the Probation Office on April 22, 2014, setting forth our objections. We have not received a copy of objections submitted by the government to the Draft PSR, if any, or a copy of the final Presentence Report yet. According to the Court's Individual Rules and Practices in Criminal Cases, we are filing this sentencing submission on May 7, 2014, which is two weeks in advance of the May 21 date set for sentencing. However, because we do not have the final Presentence Report yet, our discussion of the sentencing guidelines is addressed to the draft Presentence Report dated April 15, 2014.

We agree with the Probation Office's calculation of the sentencing guidelines in this matter set forth in the Draft PSR. Pursuant to U.S. Sentencing Guidelines Manual ("USSG") § 2E3.1(a)(3), the base offense level is 6. (Draft PSR ¶ 34). Pursuant to USSG § 3E1.1(a), a two-level reduction for acceptance of responsibility is recommended. (Draft PSR ¶ 41). Thus, Abe's total offense level is 4. (Draft PSR ¶ 42). Abe has no Criminal History points. (Draft PSR ¶ 45). Accordingly, his Guidelines range is 0 to 6 months' imprisonment. (Draft PSR ¶ 85). Because the Guidelines range is in Zone A of the Sentencing Table, a sentence of imprisonment is not required, pursuant to USSG § 5C1.1(b). *Id.* If the Court imposes probation, the term shall be no more than three years, pursuant to USSG § 5B1.2(a)(2). (Draft PSR ¶ 90). Lastly, the fine range for this offense is $250 to $5,000. (Draft PSR ¶ 94).

**B.     The Offense Conduct**

As discussed above, Abe is a professional gambler who occasionally made one-on-one sports bets with Noah Siegel. Noah Siegel was not Abe's bookie, and no one needed to pay a vigorish on those bets. Abe pled guilty to a one count misdemeanor information that charged him with aiding and abetting others to cause a state nonmember bank to accept monies paid by gamblers as bets in connection with online sports gambling. In connection with his plea, Abe stated that he assisted others to transfer funds, which represented monies he bet on sporting events, to and from banks. Abe did this in connection with his own personal gambling.

The Draft PSR includes six paragraphs devoted to the alleged membership and activities of the "Taiwanchik-Trincher Organization." (Draft PSR at ¶¶ 9-14). The alleged activities of the Taiwanchik-Trincher Organization include laundering tens of millions of dollars in proceeds from their gambling operations in Russia and the Ukraine through shell corporations and bank accounts in Cyprus. (Draft PSR at ¶ 10). The alleged membership of the Taiwanchik-Trincher Organization is described as including Russian mobsters and other "high-level criminals from the

6

former Soviet Union." (Draft PSR at ¶¶ 9, 11). These descriptions appear to be a summary of the allegations in the initial Indictment, and we expect that these paragraphs have been used, in whole or in part, in the PSRs of the other defendants named in the initial Indictment.

However, Abe was not a member of the Taiwanchik-Trincher Organization, and neither the Indictment nor the government ever alleged that he was. Indeed, Abe's conduct had nothing to do with them. Although the Court "must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed," *Wasman v. United States*, 468 U.S. 559, 563 (1984), here, the membership and activities of the Taiwanchik-Trincher Organization are completely and wholly unrelated to Abe and therefore cannot reasonably bear on him or the crime committed.

Similarly, the Draft PSR includes ten paragraphs providing an overview of the "Nahmad-Trincher Organization," which is described as a "nationwide criminal enterprise" that "ran a high-stakes, illegal gambling business that catered primarily to multi-millionaire and billionaire clients." (Draft PSR at ¶¶ 15-22, 24-25). Again, these descriptions appear to be a summary of the allegations in the initial Indictment, and we expect that these paragraphs have been used in the PSRs of the other defendants named in the initial Indictment. Abe was never alleged to be a member of the Nahmad-Trincher Organization. In particular, Abe denies that he "assisted the Nahmad-Trincher Organization in operating their illegal gambling business," and denies that he "helped secure illegal online betting accounts . . . ." (Draft PSR at ¶ 23). Rather, Abe was an individual bettor who occasionally made one-on-one bets with Noah Siegel. Abe and Noah Siegel did not use a bookie for these bets. Rather, they bet one-on-one with each other, with no vigorish needed to be paid on the bets. To the extent that the Probation Office does not agree with our objections and does not delete or edit paragraphs 9-25 of the Draft PSR, particularly

paragraph 23, we respectfully submit that the Court should not consider such matters in sentencing, pursuant to Rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure.

### C. Consideration of the Factors Listed in 18 U.S.C. § 3553(a)

Following *United States v. Booker*, 543 U.S. 220 (2005), sentencing courts are obligated to impose a sentence in accordance with Title 18, United States Code, § 3553(a), and are required to "treat the Guidelines only as a starting point, and then to craft an appropriate sentence taking full account of 'the history and characteristics of the defendant.'" *United States v. Preacely*, 628 F.3d 72, 84 (2d Cir. 2010) (J. Lynch concurring) (internal citation omitted). After evaluating the Sentencing Guidelines and calculating a potentially applicable Guidelines range, a sentencing court must consider the remaining Section 3553(a) factors in order to "impose a sentence sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). In addition to the history and characteristics of a defendant, sentencing courts have an obligation to consider factors that were discouraged under the pre-*Booker* mandatory Guidelines regime, such as the nature of the offense, the need for deterrence, the likelihood of recidivism, and the public's need for protection. Sentencing courts are obligated to evaluate these factors in order to determine the appropriate punishment for a particular defendant, thereby "achieving somewhat more individualized justice." *United States v. Crosby,* 397 F.3d 103, 114 (2d Cir. 2005). Here, we respectfully submit that a minimal sentence at the low end of the Guidelines range is appropriate under all of the relevant circumstances.

#### 1. History and Characteristics of the Defendant

Under Section 3553(a), the court must consider "the history and characteristics of the defendant" when imposing a sentence. *See* 18 U.S.C. § 3553(a)(1). As discussed above, Abe has strived to live a law-abiding life, and prior to the instant case, he has never had any brush

with the law. Even though he has chosen the path of a professional gambler, he has not gambled with his reputation or his integrity. Abe files his taxes and pays his child support on time. (Draft PSR ¶¶ 52, 82). In fact, for each of the past five years, Abe has overpaid his taxes, and has applied the amount that otherwise would have been refunded to his estimated taxes for the next year. (Draft PSR ¶ 82).

As every letter attests, Abe is an honest, decent, and generous person. His aunt describes him as "honest and forthright, a real straight shooter." (Ex. A at 1). Eileen Bressler writes that Abe is "a wonderful human being, and a trustworthy friend." (Ex. A at 2). She continues:

> Over the years, Abe has been a great sounding board and doled out good, sound advice. He is there when I need an ear to listen and is the voice of reason. He's very practical and honest, and never just tells you what you want to hear. He has always had integrity, and he's always someone I can count on, no matter how far apart we are geographically.

(Ex. A at 2).

His friend Ted Louloudes states that Abe is "honest and caring." (Ex. A at 3). People who have done business with Abe, such as Marty Benson, write that Abe was "respectful" and that they would work again with him. (Letter from Marty Benson, Ex. A. at 4). David Hackett, the assistant managing editor of the Sarasota Herald-Tribune newspaper, writes that Abe "has great respect for the law and is committed to playing by the rules." (Letter from David M. Hackett, Ex. A at 6). Abe's friend David Stone describes Abe as a "decent man that cares about people," and as someone who "has been there for support for both friends and family in their time of need." (Letter from David M. Stone, Ex. A at 5). David Stone writes that "Abe is the type of man that learns from his mistakes and will become a better man from this." *Id.* We respectfully submit that Abe already has learned from this mistake.

9

       2.      <u>Nature of the Offense</u>

Section 3553(a)(1) requires the Court to consider the "nature and circumstances of the offense" in determining an appropriate sentence.  Abe pled guilty to a one count misdemeanor information that charged him with aiding and abetting others to cause a state nonmember bank to accept monies paid by gamblers as bets in connection with online sports gambling.  In connection with his plea, Abe stated that he assisted others to transfer funds, which represented monies he bet on sporting events, to and from banks.  Abe did this in connection with his own personal gambling.  Without minimizing his conduct, Abe was not a member of any illegal gambling business, nor were his actions designed to assist any illegal gambling business.  Rather, Abe crossed the line and committed the offense in connection with his own personal gambling.

       3.      <u>Need to Protect the Public</u>

In determining an appropriate sentence, the court must weigh the need to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).  We respectfully submit that given his good character, lack of any criminal history, compliance with the terms of his pretrial release, and plea to a misdemeanor offense, Abe poses absolutely no risk of recidivism or danger to the public.

       4.      <u>Need for Deterrence</u>

Section 3553(a) also lists the need to "afford adequate deterrence to criminal conduct" as another factor to consider during sentencing.  *See* 18 U.S.C. § 3553(a)(2)(B).  Here, a minimal sentence is more than sufficient to achieve deterrence.  While "Abe is the type of man that learns from his mistakes and will become a better man from this" (Ex. A at 5), this case has already caused Abe to learn a painful lesson.  His indictment and subsequent guilty plea has caused shame and embarrassment to Abe and his family.  As his aunt recounts, this has been "a trying time for his family and all those that love and worry about him." (Ex. A at 1).  The stress from

the Indictment and pending case affected Abe's concentration and caused him to lose focus. Without his concentration and focus, Abe's poker playing was adversely affected, resulting in a period of over one year when Abe has not had any significant winnings or source of income. In addition, Abe forfeited $20,000 as part of his plea agreement. By accepting responsibility and pleading guilty, Abe hopes to put this behind him and return to his otherwise law-abiding life.

Moreover, because Abe was indicted with over 30 defendants who were facing unrelated and more serious charges, he has been unfairly damaged by association with members of the Russian mafia and other alleged hardened criminals. Indeed, the headline of the U.S. Attorney's Office's and FBI's press release at the time of the Indictment was "Manhattan U.S. Attorney Charges 34 Members and Associates of Two Russian-American Organized Crime Enterprises with Operating International Sportsbooks that Laundered More than $100 Million." *See* FBI Press Release, April 16, 2013, *available at* http://www.fbi.gov/newyork/press-releases/2013/manhattan-u.s.-attorney-charges-34-members-and-associates-of-two-russian-american-organized-crime-enterprises-with-operating-international-sportsbooks-that-laundered-more-than-100-million. Subsequent articles in the press have followed law enforcement's lead and sought to wrongly link Abe with the Russian mob and money laundering. *See, e.g.,* R. Kolker, "Manhattan Fold 'Em," *New York Magazine*, July 8-15, 2013 (mentioning that Abe was indicted in a "sprawling 84-page federal indictment" that connects a high-stakes poker game at the Plaza Hotel to "a $100 million gambling and money-laundering operation orchestrated by the Russian mob"); R. Behar, "Scenes from An Arraignment: Billionaire Art Scion Helly Nahmad and Pals in $100 Mil Russian Mob Gambling Case, " *Forbes,* April 20, 2013 (featuring Abe's photograph and noting that the FBI disseminated Abe's photograph as part of its "fugitive alert," despite the fact that Abe surrendered); *see also* FBI Press Release, "NY Fugitive Abraham

11

Mosseri:  Abraham Mosseri, 40, is wanted for his role in operating an illegal bookmaking operation," *available at* http://www.fbi.gov/newyork/press-releases/2013/image/ny-fugitive-abraham-mosseri/view.[1]   Long after this case is over, Abe will continue to have to deal with adverse press that wrongly associates him with the Russian mob and money laundering.

These repeated and continual references associating him with the Russian mob have not only tarnished Abe's reputation, but they have caused harm to his business dealings.  For example, Wells Fargo informed Abe that their Anti-Money Laundering and Compliance Group has determined that they no longer want Abe as a client.  This determination is not appealable or reviewable, and we understand that it was based largely on the allegations in the indictment and the press, and not based on Abe's conduct.  In this regulatory environment, it is not hard to see how a bank's compliance department would find it easier and safer to discontinue the bank's long-standing relationship with Abe, rather than have to justify the reason they continued to do business with a client who was indicted with Russian mobsters, and linked to an alleged $100 million money-laundering operation, no matter that the facts contradict this.  Abe is also concerned that his unfairly-tarnished reputation will adversely affect his ability to attract sponsors as a professional poker player, as well as discourage producers from inviting Abe to participate in televised poker tournaments or events.

     5.     <u>Need to Avoid Sentencing Disparities</u>

Under 18 U.S.C. § 3553(a)(6), courts must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Abe pleaded guilty to a misdemeanor offense, has a total offense level of 4,

---

[1] While the internet may be forever, it is still disconcerting that this FBI press release - which incorrectly lists Abe as a fugitive - is still available today without any qualification or update.

and has a Guidelines range of 0 to 6 months. In this case, the Court has sentenced several defendants, who pleaded guilty to felony offenses, to non-jail sentences. Specifically:

- Bryan Zuriff had a Guidelines range of 6 to 12 months imprisonment, and was sentenced to two years of probation with six months home confinement, along with community service and a fine. (Docket No. 471).

- William Barbalat had a Guidelines range of 6 to 12 months imprisonment, and was sentenced to two years of probation and community service. (Docket No. 522).

- Justin Smith had a Guidelines range of 6 to 12 months imprisonment, and was sentenced to two years' probation with three months home confinement, community service and a fine. (Docket No. 560).

- David Aaron had a Guidelines range of 6 to 12 months, and was sentenced to one year probation and community service. (Docket No. 651).

- Nicholas Hirsch had a Guidelines range of 6 to 12 months imprisonment, and was sentenced to two years of probation, community service, and a fine. (Docket No. 676).

- Noah Siegel had a Guidelines range of 6 to 12 months imprisonment, and was sentenced to two years of probation with three months home detention, community service, and a fine. (Docket No. 822).

- Yugeshwar Rajkumar had a Guidelines range of 8 to 14 months imprisonment, and was sentenced to three years of probation with eight months of home detention, community service, and a fine. (Docket No. 757).

- Moshe Oratz had a Guidelines range of 8 to 14 months imprisonment, and was sentenced to two years of probation with three months home detention, community service, and a fine. (Docket No. 807).

- Michael Sall had a Guidelines range of 6 to 12 months imprisonment, and was sentenced to two years of probation and a fine. (Docket No. 854).

- Molly Bloom had a Guidelines range of 0 to 6 months imprisonment, and was sentenced to one year of probation, community service, and a fine. (Docket No. 910).

As such, a custodial sentence, even one that includes home detention, for Abe certainly would create exactly the unwarranted disparity that 18 U.S.C. § 3553(a)(6) protects against. We respectfully submit that if the Court decides to impose probation, it should be a term less than one year, in order to avoid unwarranted sentencing disparities between Abe, who pled guilty to a misdemeanor offense and faces a Guidelines range of 0 to 6 months, and other defendants who pled guilty to felony offenses and faced Guidelines ranges significantly higher. However, we respectfully submit that given all the factors in Section 3553(a), a term of probation is not even required, and a fine within the Guidelines range would be a sufficient punishment in this case.

## V. CONCLUSION

Abraham Mosseri pleaded guilty to a misdemeanor offense and faces a Guidelines range of 0 to 6 months and fine range of $250 to $5,000. In light of all of the circumstances in this case, including Abe's background and character; the nature of the offense; his lack of any criminal history; his forfeiture of $20,000; and the fact that he his reputation has been permanently tarnished by repeated and continual references wrongly associating him with the Russian mob, we respectfully request that the Court impose a sentence consisting of a modest fine not to exceed $5,000, which we respectfully submit is "sufficient, but not greater than necessary" to satisfy the goals of sentencing in this case.

        Respectfully submitted,

        Loeb & Loeb LLP

        /s/   Jay K. Musoff
        Jay K. Musoff
        345 Park Avenue
        New York, NY  10154
        Telephone: (212) 407-4212

        Attorneys for Defendant

Dated:  May 7, 2014